

1995 Decisions

12-29-1995

# New Jersey Hosp. Assn v. Waldman

Precedential or Non-Precedential:

Docket 95-5391

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"New Jersey Hosp. Assn v. Waldman" (1995). *1995 Decisions.* Paper 329.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/329

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95-5391
_____

THE NEW JERSEY HOSPITAL ASSOCIATION,

                              Appellant,

        v.


WILLIAM WALDMAN,
VELVET MILLER,
LEONARD FISHMAN
_____

Appeal From the United States District Court
for the District of New Jersey
(D. C. Civ. No. 95-cv-1260)
_____

Argued September 15, 1995

Before:  SLOVITER, Chief Judge, ALITO and SEITZ, Circuit Judges.

Filed:  December 29, 1995
_____


Mark H. Gallant, Esq. (Argued)
Thomas McKay, III, Esq.
Marcy C. Panzer, Esq.
Cozen & O'Connor
1900 Market Street
Philadelphia, PA 19103

   Attorneys for Appellant


Mark H. Lynch, Esq. (Argued)
Covington & Burling
1201 Pennsylvania Ave.
Washington, DC 20044

   Attorney for Appellees

_____

OPINION OF THE COURT
_____

SEITZ, Circuit Judge.

The New Jersey Hospital Association ("NJHA") instituted this action challenging the reduction of Medicaid reimbursement for general inpatient hospital services as set by the New Jersey Department of Human Services, Division of Medical Assistance and Health Services. NJHA seeks declaratory and prospective injunctive relief under 42 U.S.C. § 1983 claiming certain New Jersey state officials violated the procedural and substantive requirements of the Boren Amendment to the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A), in setting the new payment rates effective March 6, 1995. Here, NJHA appeals from the district court's order denying its application for a preliminary injunction seeking to invalidate the new rates. The district court had jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

I. FACTS

A. The Parties

NJHA is a non-profit association representing seventy-one of the eighty-four hospitals in New Jersey that receive Medicaid reimbursement from the State of New Jersey. The defendants in this action are William Waldman, the Commissioner of the Department of Human Services ("DHS"), Velvet Miller, the

Director of the Division of Medical Assistance and Health Services of DHS, and Leonard Fishman, the Commissioner of the New Jersey Department of Health ("DOH"). The defendants have been sued in their official capacities. DHS is the state agency responsible for New Jersey's Medicaid Program, and the Division of Medical Assistance and Health Services is the office within DHS that administers the program. DOH assists DHS with Medicaid rate-setting. In this opinion, the defendants will be referred to as "New Jersey" or "the State."

### B.  Medicaid and the Boren Amendment

The Medicaid program "`establishes a joint federal and state cost-sharing system to provide necessary medical services to indigent persons who otherwise would be unable to afford such care.'" Temple Univ. v. White, 941 F.2d 201, 205 (3d Cir. 1991) (quoting Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306, 1309 (2d Cir. 1991)).  State participants receive federal Medicaid funds in return for administering a Medicaid program. They are obligated to comply with certain federal statutory and regulatory requirements in developing their programs. See West Va. Univ. Hosps., Inc. v. Casey, 885 F.2d 11, 15 (3d Cir. 1989).

Historically, states paid hospitals the "reasonable costs" of services actually provided. See Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 507 n.7 (1990).  This amounted to payment for the actual costs incurred by hospitals in providing care to Medicaid recipients, regardless of disparities in costs or efficiencies among hospitals.  However, in 1981 Congress

enacted the Boren Amendment to the Social Security Act, which gave state participants the ability to alter the Medicaid repayment methodology.  States were given more flexibility to formulate their rates.  Programs could include statewide or classwide rates, rates based on a prospective cost, or incentive provisions to encourage efficiency.  Flexibility was ensured by limiting federal oversight. See id. at 507.  The Amendment "replaced the `reasonable cost' standard with the current standard of `reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities.'" West Va. Univ. Hosps., 885 F.2d at 15.

In order to qualify for federal financial support, a participating state must submit a "State Plan" or a change in payment methods and standards to the Heath Care Financing Administration of the Department of Health and Human Services ("HCFA"). See 42 U.S.C. § 1396a(a).  The state must make findings and give assurances to the HCFA that its program comports with federal requirements. Id.  Such findings and assurances also must be made whenever a state changes its payment methods and standards. See 42 C.F.R. § 447.253(a) & (b).

### C.  New Jersey's Medicaid Program

#### 1.  1993 Repayment Methodology

In 1993, New Jersey formulated a standardized, predetermined, statewide payment amount for over 700 separate Diagnosis Related Grouping's ("DRGs").  DRGs represent groups of patients that are clinically similar to one another and

relatively homogeneous with respect to resource utilization.  For each hospital serving the state, rates were set for each DRG and a statewide "mean" for each DRG was established.  To determine the "mean," the State used 1988 hospital costs and 1991 billing data.  Inflation factors were used to update 1988 hospital costs to 1993 levels.  In addition, the mean-based DRGs were increased by a 2.5% "operating margin" factor to create a margin surplus.  DRG payments included a capital cost allowance and a 9.15% adjustment designed to ease the transition from the pre-1993 system, which provided higher payments.  The payment that a hospital received for a "medicaid discharge" depended on the DRG into which it fell.

### 2.  Revision of the 1993 System

In early 1994, New Jersey decided to overhaul its 1993 Medicaid payment system.  Basically, the new Medicaid rate-setting methodology made four changes to the previous repayment system.  Payments of the 9.15% transition adjustment, 2.5% operating margin, and capital cost allowance were eliminated. The fourth change consisted of a "median-plus 5%" DRG standard in place of the 1993 "mean-based" DRG standard.  Once again, 1988 hospital costs, adjusted for inflation, were the benchmarks for each DRG.

### D.  District Court's Opinion

NJHA's complaint seeks, inter alia, an injunction prohibiting use of the new rate-setting methodology, as well as a

requirement that the State return to the methodology used in the 1993 system. This action presently is pending before the district court. NJHA also sought a preliminary injunction. After a hearing thereon, the district court ruled that substantial compliance had been shown with respect to both the procedural and substantive requirements of the Boren Amendment. On that basis, it found that NJHA failed to demonstrate a reasonable likelihood of success on the merits. It thereupon denied a preliminary injunction solely on that ground. NJHA appeals.


## II.  ANALYSIS

### A.  Preliminary Injunction

In reviewing the district court's order denying NJHA's motion for a preliminary injunction, "`[w]e review the district court's conclusions of law in a plenary fashion, its findings of fact under a clearly erroneous standard, and its decision to grant or deny the injunction for an abuse of discretion.'" AT & T v. Winback and Conserve Prog. Inc., 42 F.3d 1421, 1427 (3d Cir. 1994) (quoting Johnson & Johnson–Merck Consumer Pharmaceuticals, Inc. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc., 19 F.3d 125, 127 (3d Cir. 1994)).  Those standards are employed in judging the following factors:

> (1) the likelihood that the plaintiff will prevail on the merits at the final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. The injunction shall issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief.

Id. (quoting Merchant & Evans, Inc. v. Roosevelt Bldg. Prods., 963 F.2d 628, 632–33 (3d Cir. 1992)).

As a threshold matter, New Jersey argues that NJHA cannot satisfy the irreparable injury requirement because each hospital has an adequate state law remedy which should be pursued. It points to New Jersey Administrative Code 10:52-9.1(b)(2) which provides in pertinent part that a hospital may seek an adjustment to its rates if it can demonstrate that it "would sustain a marginal loss in providing inpatient services to Medicaid recipients at the rates under appeal even if it were an economically operated hospital." (emphasis added). A hospital not satisfied with the administrative determination may seek judicial review in the Appellate Division of the New Jersey Superior Court. See N.J. Admin. Code tit. 10, § 52-9.1(d)(1995).

For purposes of these proceedings, New Jersey has defined marginal cost as 60% of actual costs. By using 60% as marginal cost, almost no hospital will be able to seek adjustment of its rates. More important, the administrative appeal process is directed at an individual hospital's reimbursement rates, not the methodology and implementation of New Jersey's entire Medicaid Reimbursement Program. We therefore conclude that the use of the state's administrative remedy would not preempt this action.

We turn now to the application of the Boren Amendment to this case. In that respect, we are not without guidance from this court. See, e.g., Temple Univ., 941 F.2d 201 (reviewing Pennsylvania's Medicaid reimbursement rates to in-state hospitals); West Va. Univ. Hosps., 885 F.2d 11 (reviewing Pennsylvania's Medicaid reimbursement rates to out-of-state

hospitals). NJHA appears to appeal only the narrow question of New Jersey's procedural compliance with the Boren Amendment. This court has taken the view that the Boren Amendment contains both a procedural and substantive dimension. Id. at 29. However, the line between the two is often blurred. We, therefore, conclude that review is facilitated, if not required, by examining both procedural and substantive aspects of a state's plan. Accordingly, we will address New Jersey's overall compliance with the Boren Amendment.[1]

### B. The Boren Amendment

In undertaking our review of New Jersey's new program, we begin with the pertinent language of the Boren Amendment:

> A State plan for medical assistance must-- . . . provide-- . . . for payment . . . of the hospital services . . . provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State . . . and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs . . .) which the State finds and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated

---

[1] While NJHA appears to seek review of procedural compliance alone, it states: "The central issue raised below and on appeal is whether DHS properly engaged in an objective review of economy and efficiency, and rendered bona fide `findings' capable of supporting assurances that the resulting rates were `reasonable and adequate' and not likely to impair reasonable `access' to services." Appellant's Brief at 14. As discussed infra, this Court has deemed the "reasonable and adequate" and the "reasonable access" requirements as being substantive in nature. Thus, NJHA necessarily seeks review of the State's procedural and substantive compliance.

> facilities in order to provide care and services . . . and to assure that individuals eligible for medical assistance have <u>reasonable access</u> (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality.

42 U.S.C. § 1396a(a)(13)(A)(emphasis added). Initially, in interpreting a state's plan, we note that the legislative history of the Amendment manifests Congress's strong concern that its procedural and substantive requirements be "invariably and fully satisfied." <u>West Va. Univ. Hosps.</u>, 885 F.2d at 24. We turn to our interpretive task with that caveat in mind.


### 1. Substantive Compliance

This Court has observed that the Boren Amendment "authorizes states to develop their own Medicaid reimbursement standards and methodologies for payment for hospital services, but subjects those standards and methodologies to three general federal requirements." <u>Id.</u> at 22. Those requirements mandate that a state's rates

> (1) take into account the circumstances of hospitals serving a <u>disproportionate share</u> of low income patients;
>
> (2) are <u>reasonable and adequate</u> to meet the necessary costs of an efficiently operated hospital; and
>
> (3) are reasonable and adequate to assure medicaid patients of <u>reasonable access</u> to inpatient hospital care.

See <u>Temple Univ.</u>, 941 F.2d at 210 (citing <u>West Va. Univ. Hosps.</u>, 885 F.2d at 22). The implementing regulations for

§1396a(a)(13)(A) reiterate these statutory requirements. <u>See</u> 42

C.F.R. § 447.253(b).[2]

        a.    "Disproportionate Share" and "Reasonable Access"
            Requirements

_____

[2](a) State assurances.  In order to receive HCFA approval of a State plan change in payment methods and standards, the Medicaid agency must make assurances satisfactory to the HCFA . . . and must comply with all other requirements of this subpart.

(b) Findings.  Whenever the Medicaid agency makes a change in its methods and standards, but not less often then annually, the agency must make the following findings:

(1) Payment rates. (i) The Medicaid agency pays for inpatient hospital services and long-term care facility services through the use of rates that are <u>reasonable and adequate</u> to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.

    (ii) With respect to inpatient hospital services--
    (A) The methods and standards used to determine payment rates take into account the situation of hospitals which serve a <u>disproportionate number of low income patients</u> with special needs; [and]

    . . . .

    (C) The payment rates are adequate to assure that recipients have <u>reasonable access</u>, taking into account geographic location and reasonable travel time, to inpatient hospital services of adequate quality.

42 C.F.R. § 447.253 (a) & (b) (emphasis added).

In enacting the Boren Amendment, there was a congressional concern that states account for the special circumstances of those hospitals serving a large number of Medicaid patients. West Va. Univ. Hosps., 885 F.2d at 23 (citing H.R. Rep. No. 158, 97th Cong., 1st Sess. 294-96 (1981)). Moreover, Congress was concerned that a state's rates not be so low as to cause the closing of a "dangerous number of hospitals or of a single medically important facility" necessitating unreasonable travel for Medicaid patients. Id. (citing H.R. Rep. No. 158, 97th Cong., 1st Sess. 294 (1981); H.R. Conf. Rep. No. 208, 97th Cong., 1st Sess. 962, reprinted in 1981 U.S.C.C.A.N. 1010, 1324). In developing its reimbursement rates, a state is required to take into account the situations of those hospitals serving a disproportionate share of low income patients and to find that its rates assure Medicaid patients reasonable access to inpatient hospital care. With respect to these substantive requirements this Court has said:

> We will not presume to declare how the State must satisfy these requirements, but neither will we defer to the State's judgment that the requirements have indeed been met.

West Va. Univ. Hosps., 885 F.2d at 24. Accordingly, a state's compliance with the disproportionate share and reasonable access requirements is subject to our plenary review. Id.

b. "Reasonable and Adequate" Requirement

In addition to the two previously identified requirements, a state must find that its rates are reasonable and

adequate to meet the necessary costs of an efficiently operated hospital.  However, this Court has said that a court should not undertake an independent assessment of what rates it believes are reasonable and adequate.  Rather, the assessment should concern itself with whether the rates are "arbitrary and capricious." Id.

In West Virginia University Hospitals, it was noted that in promulgating the regulations implementing § 1396a(a)(13), the HCFA expressly declined to prescribe "reasonable and adequate" rates. Id. at 26.  The Court observed that "`the term is not a precise number, but rather a rate which falls within a range of what could be considered reasonable and adequate.'" Id. (quoting 48 Fed. Reg. 56,046, 56,049 (Dec. 19, 1983)).  Thus, a state must show a rational basis for its Medicaid program.  This requires "`a rational connection between the facts found and the choices made.'" Id. at 28 (internal quotations omitted)(quoting Colorado Health Care Ass'n v. Colorado Dep't of Social Servs., 842 F.2d 1158, 1167 (8th Cir. 1988)).  Accordingly, the Boren Amendment contemplates a "deferential" standard of review by the courts in assessing compliance with the reasonable and adequate requirement. Id. at 23.  With the appropriate standards of review in mind, we turn to an analysis of New Jersey's Medicaid Plan to determine whether NJHA has shown the likelihood that it will prevail on the merits of its claim that New Jersey violated the Boren Amendment.

   (i) New Jersey's Consideration of Hospitals Serving a Disproportionate Number of Low Income Patients.

Initially, we consider whether New Jersey took into account the situations of those hospitals serving a disproportionate number of low income patients in developing its new rates. The district court seems not to have addressed this requirement in reviewing New Jersey's substantive compliance with the Boren Amendment, as no mention of it can be found in the court's opinion. However, it appears that the State gave some consideration to the "disproportionate share" requirement. We, therefore, will undertake plenary review of New Jersey's compliance with the "disproportionate share" requirement using the record before us.

In addition to reimbursement as determined by the new methodology, hospitals receive disproportionate share ("DSH") payments in respect of their Medicaid shortfall and their costs of treating the uninsured. See Declaration of John Guhl, Assistant Director for Budget Affairs of the Division of Medical Assistance and Health Services of DHS ("Guhl Decl.") ¶ 30, Joint Appendix ("J.A.") at 340. Hospitals also receive DHS payments under the Medicare program by treating a high volume of low income patients, including recipients of Medicaid. Id. However, even with evidence of these additional payments, the record is unclear as to how the new reimbursement program will impact those hospitals serving a large number of Medicaid patients. Therefore, we are unable to determine the extent or adequacy of the State's consideration of the "disproportionate share" requirement. Nonetheless, the record before us indicates some evidence of compliance, and this Court has no evidence to the contrary.

Accordingly, we are not prepared to say NJHA has shown the likelihood of succeeding on the ground that the "disproportionate share" requirement was not satisfied.

> (ii) Requirement that New Jersey's Rates Assure Medicaid Patients Reasonable Access to Quality Hospital Care, Taking Into Account Geographic Location and Reasonable Travel Time.

In developing its reimbursement rates, a state is required to find that its rates assure Medicaid patients reasonable access to inpatient hospital care. See West Va. Univ. Hosps., 885 F.2d at 22-23. NJHA asserts that the State "made no bona fide findings concerning the impact of the cuts on access to care and quality of care." Brief for Appellants at 34. While NJHA attacks this lack of findings on procedural grounds, we consider this requirement to be substantive in nature, albeit one having procedural prerequisites. Once again, we undertake plenary review of New Jersey's compliance with this requirement on the record before this Court.

The State argues that "[t]he district court had a convincing array of evidence on access before it when it considered NJHA's request for preliminary injunctive relief." Brief for Appellees at 43. Moreover, it asserts that "[t]he strength of the record on this issue supports the district court's implicit finding that NJHA would be unlikely to succeed on the merits of a substantive challenge based upon a lack of access." Id.

The district court failed to address individually the "reasonable access" requirement. Also, it did not articulate the plenary standard of review to which we subject a state's compliance with either the "disproportionate share" or "reasonable access" requirements. Consequently, we are uncertain whether the district court would have found implicitly or explicitly that New Jersey complied with the "reasonable access" requirement had it reviewed the plan for its impact on access under the proper standard of review.[3] Hampered as we are by the district court's failure to address this issue, we turn, in the interest of disposing of this matter, to the question of whether New Jersey considered access to quality hospital care.

In considering access, the record before this Court shows that the State took into account what it termed the "high cost coverage" of the new system which it estimated to be 90% in the aggregate. See Guhl Decl. ¶ 19, J.A. at 336. Thus, it argues access should not be affected. The State also presented evidence that New Jersey hospitals have excess bed capacity. Presuming this to be true, the State asserts that hospitals with excess beds will have an incentive to treat Medicaid patients so long as the marginal costs associated with these patients are paid and some contribution is made toward defraying hospitals' fixed costs. Moreover, it has set forth that marginal costs

---

[3]To the extent one might glean from the district court's opinion that the standard of review for substantive compliance with the Boren Amendment in this Circuit is "arbitrary and capricious," we wish to dispel that notion. Such standard of review only applies to the substantive requirement that the new rates be "reasonable and adequate."

represented 60% of hospitals' average costs. It contends that because all hospitals will be reimbursed their marginal costs under the new system, access will not be affected. Id. at ¶ 28, J.A. at 339-40; see also Brief for Appellees at 41-43 (discussing State's compliance with "access" requirement).

Conversely, NJHA points to more recent figures and argues that marginal costs are not 60% but 80% of actual costs. Brief for Appellant at 36. However, in testimony before the district court the State proffered that even if marginal costs are 80%, 69 of 84 hospitals will be reimbursed above the margin. See Transcript of Testimony of J. Guhl, J.A. at 855-57, Appellees' Supplemental Appendix at 5. NJHA challenges this proffer and asserts that only 60 hospitals will be reimbursed their marginal costs. Reply Brief of Appellant at 19.

Even if we were to accept that aggregately 90% of hospitals will receive their costs, and marginal costs are 80% so that 60 to 69 hospitals will be reimbursed their costs, the record remains deficient on the effect of the rates on hospitals in various geographic areas in New Jersey, and on travel time as dictated by the Boren Amendment and its implementing regulations. This deficiency notwithstanding, it is apparent that the State gave some consideration to the "reasonable access" requirement. Thus, although we cannot say with confidence how access will be affected, we still are not prepared to say, in the context of a preliminary injunction, that NJHA has shown the likelihood of succeeding on its challenge to the State's compliance with the "reasonable access" requirement. At the final hearing, the

record should be developed to determine whether under the new system a dangerous number of hospitals in one geographic area or a single important medical facility would be forced to close or seriously reduce services to the detriment of the communities they serve.  If the new rates create such dangers, the obvious intent that states account for the special circumstances of those hospitals serving a large number of Medicaid patients would be violated.

> (iii)  Requirement that New Jersey's Rates
> are Reasonable and Adequate to Meet the Costs
> of an Efficiently Operated Hospital.

We turn to the third substantive requirement, viz., whether New Jersey's rates are "reasonable and adequate" to meet the costs of an efficiently operated hospital.  In the past, we have noted that "[w]hereas the substantive dimensions of the first two requirements could be easily drawn from the statute and its legislative history, discerning legislative intent with respect to the substantive element of the reasonable and adequate requirement is a more daunting project." West Va. Univ. Hosps., 885 F.2d at 26.

We note, once again, that we exercise a deferential standard of review in determining whether the State's actions were arbitrary and capricious in formulating the new rates. Under this standard, we are cautioned that we should not undertake an independent assessment of what rates we believe are reasonable and adequate.  Rather, we should concern ourselves with whether

New Jersey's determination was "arbitrary and capricious."
Thus, the State need only show a rational basis for its Medicaid
program.  Therefore, we will examine New Jersey's plan as a
whole.

As the district court found, in determining the
statewide median for each DRG category, the State used the same
1988 hospital cost reports that it used to calculate the
statewide mean for each DRG in development of the 1993 rates.  It
then employed various inflation factors to raise the 1988 median
costs for each DRG to the most current year costs.  The district
court was not persuaded that the 1988 cost data was stale or
outdated.  New Jersey Hosp. Ass'n v. Waldman No. 95-1260, 1995 WL
465664, at *10 (D.N.J. May 25, 1995).  The 1995 median-based
reimbursement methodology also includes additional payments for
high length of stay outlier[4] cases to remunerate hospitals for
extraordinary costs sometimes incurred in treating Medicaid
patients.  NJHA, while arguing that use of 1988 costs adjusted by
the various inflation factors is improper, nevertheless asks us
to maintain the 1993 mean-based methodology which employs the
same 1988 costs similarly adjusted for inflation.  The
difference, as we see it, is that the payout using the 1993
methodology produces a more favorable result for NJHA members.

> In West Virginia University Hospitals we noted:
> It follows from the departure from a cost-
> driven reimbursement standard that a state's

---

[4]"Outlier" cases are those that have either an extremely long
length of stay or extraordinarily high costs when compared to
most discharges classified under the same DRG. See 48 Fed. Reg.
39752, 39776 (September 1, 1983).

> plan does not violate the substantive
> provision of the reasonable and adequate
> requirement simply because it fails to
> reimburse one efficiently operated hospital
> its actual costs.  What matters, rather . . .
> is whether the reimbursement rates . . . <u>in
> the aggregate</u> are arbitrary and capricious.

885 F.2d at 26 (emphasis added).  The district court found that one of NJHA's own experts estimated under the 1995 median-based system that New Jersey hospitals will be reimbursed in the aggregate 83.36% of the costs they incur in treating Medicaid patients in 1995.  Another NJHA expert compared 1993 Medicaid costs to 1993 Medicaid payments using the 1995 median-based system and found that in the aggregate 81.75% would have been reimbursed using the new system.  The State asserts that upon comparing hospitals' 1993 Medicaid costs to 1993 payments under the new methodology, cost coverage would be over 90% in the aggregate.  <u>New Jersey Hosp. Ass'n</u>, 1995 WL 465664, at *12.

Moreover, the district court noted that the changes made to New Jersey's Medicaid program were prompted by the following:

> DHS found that New Jersey hospitals' costs
> per discharge are the third highest in the
> nation.  DHS also discovered that New
> Jersey's inpatient hospital payments per
> Medicaid recipient are the third highest in
> the nation.  Moreover, DHS found that New
> Jersey hospitals' average length of stay for
> Medicare patients is 11.07 days as compared
> to the national average of 8.0 days.  Lastly,
> DHS determined that under New Jersey's then-
> current Medicaid payment system, New Jersey
> hospitals were paid in excess of their actual
> costs (113% of costs in the aggregate). Thus,
> DHS was concerned that the then-current
> medicaid system violated the federal upper

> limit.  As a result, DHS determined that the
> mean-based DRG system was ripe for change.

Id. at *3 (citations omitted).

Based on the foregoing findings of fact made by the district court concerning the State's findings, which we cannot say are clearly erroneous, and giving deference to the State, we are not prepared to say that NJHA has shown, for preliminary injunction purposes, that New Jersey's rates overall are unreasonable and inadequate.  We so conclude because we cannot say on this record that the rates were developed in an arbitrary or capricious manner.  Thus, we hold that NJHA has not shown the likelihood of succeeding on its challenge to the State's substantive compliance with the Boren Amendment.  While aggregate coverage is telling, it is not dispositive.  Among other things, at a final hearing on the merits, further analysis might provide evidence as to whether a large percentage of the unreimbursed costs must be incurred by efficiently and economically operated facilities.  If this is true, evidence of aggregate cost coverage, as shown on this record, would not suffice to show compliance with the federal requirement that the rates be reasonable and adequate.  Finally, we turn to the question of whether NJHA showed the likelihood of succeeding on its claim that the State failed to comply with the procedural requirements.

2.  Procedural Compliance

In reviewing New Jersey's procedural compliance with the Boren Amendment, our review is plenary. Temple Univ., 941 F.2d at 209.

Procedurally, the State is required to give assurances that its Medicaid plan complies with the federal requirements. See 42 U.S.C. § 1396a(a)(13)(A); 42 C.F.R. § 447.253(a) & (b). This Court has held that in giving such assurances "the federal regulations implementing § 1396a(a)(13)(A) `unambiguously require the state to make findings' to support its Medicaid plan." Temple Univ., 941 F.2d at 208-09 (quoting West Va. Univ. Hosps., 885 F.2d at 30); see also Wilder, 496 U.S. at 513 n.11 (noting requirement that states make findings is a necessary prerequisite to the requirement that assurances be made).

### a.  Findings and Assurances

While assurances must be based on findings, there is no absolute mandate as to what is required in terms of meeting the "findings" requirement.  Logic dictates, however, that whatever methods a state uses in arriving at the procedurally required findings, such findings must be correct. Id. at 514.  Our language in West Virginia University Hospitals is particularly applicable here:

> The three federal provisions . . . contain both a procedural and substantive dimension. The procedural dimension is explicit in the federal regulations implementing section 1396a(a)(13)(A). These federal regulations condition HCFA approval of a new state plan on the state's assurances that it has complied with the regulatory requirements. One of these regulatory requirements is that the State make findings in support of its change in medicaid plan. Essentially, the State is required to find that its new plan complies with the three substantive requirements . . . .

885 F.2d at 29 (citation omitted).

In Temple University, we were critical of Pennsylvania's failure to make findings as to the reasonableness or adequacy of its rates to cover the costs of an efficiently and economically operated hospital. 941 F.2d at 210. In the present case, the district court noted the State's reasoning behind its selection of the median-plus 5% methodology:

> [I]t is reasonable to measure the efficiency of hospitals by comparing the costs they incur for delivering similar units of service . . . . [E]fficiency is defined or understood to mean the lowest possible cost per comparable inpatient admission.

New Jersey Hosp. Ass'n, 1995 WL 465664 at *3. Thus, the State found that its new rate system implicitly identified efficient hospitals and therefore the costs they must incur. This was accomplished by concluding that efficient hospitals will keep their costs for each DRG at or below the statewide median with certain adjustments for inflation, indirect medical education, and area wage variation. Id. at *4.

Thereafter, the State conducted empirical analyses to measure the effects of the payment program. This was accomplished by comparing the amounts the new methodology would have paid hospitals in 1993 to their actual Medicaid costs reported on their Medicare cost reports for 1993. Id. A health care consultant also was retained to review the new rate-setting methodology and the State's analyses of the new rates. Id. at *5. Additionally, the district court noted that various national indicators which evidenced inefficiency on the part of New Jersey

hospitals also played a role in the formulation process. Inefficiencies were noted in the areas of cost per discharge and average length of stay. Id. at *4.

Based on the forgoing, the district court found that the use of "1988 hospital cost data, increased to present-day costs, represents sufficiently reliable cost data when used to identify efficiently and economically operated New Jersey hospitals." Id. at *10. We cannot say that this factual finding is clearly erroneous. Thus, in light of our holding with respect to the State's substantive compliance, we conclude, for purposes of disposing of the preliminary injunction request, NJHA has not shown that the State failed to meet the procedural requirements.

We note, at a final hearing the burden of proof rests with NJHA to come forward with credible evidence that the State did not comply with the federal requirements of the Boren Amendment. See Colorado Health Care Ass'n v. Colorado Dep't of Social Servs., 842 F.2d 1158, 1164 (10th Cir. 1988). It is noteworthy that no discovery had been conducted prior to the hearing on the application for the preliminary injunction. Pending the district court's final decision on the merits, the findings of fact and conclusions of law made in conjunction with the preliminary injunction are indeed preliminary. As such, they do not foreclose any findings or conclusions to the contrary based on the record as developed at final hearing. See Oburn v. Shapp, 521 F.2d 142, 149 n.18 (3d Cir. 1975).

The district court denied NJHA a preliminary injunction solely on the ground that it had not shown the likelihood that it

would prevail on the merits.  Thus, it found it unnecessary to address the other factors to be considered when a preliminary injunction is sought.

Based solely on the ground invoked by the district court, NJHA has not shown on this record the reasonable likelihood that it will prevail on the merits.

The order of the district court denying a preliminary injunction will be affirmed.