

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-8-1999

# Cleary v. Waldman

Precedential or Non-Precedential:

Docket 97-5145

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Cleary v. Waldman" (1999). *1999 Decisions.* Paper 34.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/34

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 8, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5145

THOMAS J. CLEARY, by his next friend Carolyne Cleary;
CAROLYNE CLEARY, individually, on their own behalf and
on behalf of all other persons similarly situated,
     Appellants,

v.

WILLIAM WALDMAN, in his official capacity as
COMMISSIONER OF NEW JERSEY DEPARTMENT OF
HUMAN SERVICES; LEONARD FISHMAN, in his official
capacity as COMMISSIONER OF NEW JERSEY
DEPARTMENT OF HEALTH AND SENIOR SERVICES;
VELVET MILLER, in her official capacity as DIRECTOR
OF DIVISION OF MEDICAL ASSISTANCE AND HEALTH
SERVICES; MARK SCHIFFER, in his official capacity
as DIRECTOR OF PASSAIC COUNTY BOARD OF
SOCIAL SERVICES

NEW JERSEY ASSOCIATION OF HEALTH CARE
FACILITIES; NEW JERSEY ASSOCIATION OF NON-
PROFIT HOMES FOR THE AGING, INC.
     Intervenors-Defendants in
     District Court.

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 96-cv-04774)
District Judge: Honorable Dickinson R. Debevoise

Argued January 27, 1998

Before: SCIRICA, ROTH and RENDELL, Circuit Judges

(Opinion filed February 8, 1999)

Stephen A. Feldman, Esquire
 (Argued)
Ellen R. Wase, Esquire
Beth A. Lovitch, Esquire
Feldman & Feldman
1500 Walnut Street
Suite 904
Philadelphia, PA 19102

 Attorneys for Appellant

Charles A. Miller, Esquire (Argued)
Ann-Kelley Yelverton, Esquire
Covington & Burling
1201 Pennsylvania Avenue, N.W.
P.O. Box 7566
Washington, DC 20044

Peter Verniero
Attorney General of New Jersey
Meredith G. Van Pelt
Deputy Attorney General
Richard J. Hughes Justice Complex
Office of Attorney General of
 New Jersey
CN 112
Division of Law
25 Market Street
Trenton, NJ 08625

 Attorneys for Appellees Waldman,
 Fishman, Miller and Schiffer

Jonathan D. Weiner, Esquire
Richard J. Kravitz, Esquire
Maureen E. Kerns, Esquire
Fox, Rothschild, O'Brien & Frankel
 LLP
Princeton Pike Corporate Center
997 Lenox Drive
Building 3
Lawrenceville, NJ 08648-2311

 Attorney for Appellee New Jersey
 Association of Health Care
 Facilities

Bruce W. Clark, Esquire
Kara W. Swanson, Esquire
Dechert, Price & Rhoads
P.O. Box 5218
Princeton Pike Corporate Center
Princeton, NJ 08543-5218

 Attorneys for Appellee New Jersey
 Association of Non-Profit Homes
 For the Aging, Inc.

Achilles M. Perry, Esquire
O'Melveny & Myers LLP
Citicorp Center
153 East 53rd Street
New York, NY 10022-4611

 Attorney for Amicus Curiae
 Alzheimer Associations, NJ

Joel M. Hamme, Esquire
Joseph W. Metro, Esquire
Reed, Smith, Shaw & McClay
1301 K Street, N.W.
Suite 1100-East Tower
Washington, DC 20005

 Attorneys for Amicus Curiae
 American Health Care Association

3

OPINION OF THE COURT

ROTH, Circuit Judge.

In this appeal we must decide if New Jersey's
implementation of a portion of the Medicare Catastrophic
Coverage Act ("MCCA" or the "Act") violates Federal law.
Specifically, we must determine whether New Jersey may
employ an "income-first" approach, rather than a "resource-
first" approach, when determining Medicaid eligibility for a
spouse who is institutionalized in a long-term care facility.

I. FACTS

Thomas and Carolyne Cleary, representing themselves
and a class of persons similarly situated, sued the New
Jersey Department of Health Services to enjoin application
of its "income-first" rule. They contend that the New Jersey
rule violates the MCCA when it attributes a portion of
Thomas Cleary's income to his wife (income-first method)
instead of allowing the couple to dedicate more of their
resources to Carolyne Cleary's support (resource-first
method). The Clearys argue that the Federal statute
mandates a "resource-first" approach and that the New
Jersey rule is an impermissible construction of the Act. In
denying the Clearys' motion for injunctive relief, the District
Court held that the income-first method is a permissible
interpretation of the MCCA.

When the Clearys brought this action, Thomas Cleary
was 79 years old and suffering from Parkinson's disease
and dementia. On November 21, 1995, Thomas entered a
long-term care facility in New Jersey. A year later, Carolyne
Cleary sought Medicaid benefits on behalf of her husband
and, pursuant to the Act, requested an assessment of the
couple's assets by the Passaic County Board of Social
Services. The board determined that the Clearys' total
resources had been worth $240,000 at the time of Thomas'
institutionalization and assessed the then-current value of
their assets as $180,000.

4

Under the Spousal Impoverishment Provisions ("SIP") of the MCCA, 42 U.S.C. S 1396, et seq., several steps are taken when a couple applies for Medicaid benefits to cover the care of a spouse who has been institutionalized. First, the state must calculate the total value of the couple's resources and allocate a share of the resources to each spouse. 42 U.S.C. S 1396r-5(c)(1). The amount allocated to the community spouse is called the Community Spouse Resource Allowance ("CSRA").1 This amount then need not be spent for the care of the institutionalized spouse.

The income generated from the CSRA, along with the community spouse's other income, such as social security, makes up the community spouse's Minimum Monthly Maintenance Needs Allowance ("MMMNA"). The MMMNA is a level of income which has been estimated by the state as necessary to permit the non institutionalized spouse to live independently in the community. If either spouse is dissatisfied with the CSRA, he or she may request a "fair hearing." 42 U.S.C. S 1396r-5(e). The Clearys challenge New Jersey's method of revising the CSRA when it, along with the community spouse's other sources of income, is insufficient to meet the MMMNA.

The issue that divides the parties to this appeal is the question of what constitutes the community spouse's other sources of income. According to the Clearys, the Act provides that any shortfall between the MMMNA and the amount available to the community spouse as income is to be made up by the substitution of another CSRA, i.e., a larger portion of the couple's joint resources is to be attributed to the community spouse. The income from such a reallocated amount, along with the community spouse's other income, should then be sufficient to meet the MMMNA. This is the "resource-first" approach. However, in New Jersey, before reformulating a CSRA with a larger share of resources, the fair hearing officer will consider a contribution of income from the institutionalized spouse to

_____

1. The CSRA is the greatest of (a) $12,000, (b) the lesser of one-half total joint resources or $60,000, (c) an amount established pursuant to a fair hearing under subsection (e)(2) or (d) and amount transferred under court order. 42 U.S.C. S 1396r-5(f)(2)(A).

5

make up the shortfall between the MMMNA and the community spouse's other income. This is the "income-first" approach.

At the time she applied for Medicaid benefits for her husband, Carolyne Cleary was informed that Thomas was ineligible due to the couple's excess resources. Therefore, the Clearys were required to "spend down" their resources below a certain level before they could become eligible for Medicaid. Prior to the MCCA, an individual had to spend down all his or her resources before eligibility. The MCCA altered this by providing a protected spousal share of resources for the non-institutionalized or "community" spouse.

Pursuant to the Act, New Jersey determined that Carolyne Cleary was entitled to $1,524.50 per month as her MMMNA. At the time of the assessment, Mrs. Cleary's total monthly income was $828.25 ($516.50 in social security payment and $311.75 in interest from her CSRA). Thus, her income fell short of her MMMNA by $696.25.

Under New Jersey's income-first approach, this shortfall should be remedied by taking a portion of Thomas Cleary's income to be included as part of Carolyne Cleary's. Only after this step, will New Jersey look to other assets of the Clearys to augment Carolyne Cleary's income. The Clearys contend that this method does not conform to the provisions of the Act and that Thomas' income cannot be transferred to Carolyne. The Clearys assert that New Jersey must make up the MMMNA shortfall by allocating a larger portion of the couple's resources to Carolyne's CSRA.

The Clearys filed suit in the District Court seeking injunctive relief from application of the income-first rule. The District Court denied their motion and granted motions to intervene by the New Jersey Association of Health Care Facilities and the New Jersey Association of Nonprofit Homes for the Aging.2
_____

2. The Clearys also sought declaratory and injunctive relief in the District
Court on the issue of their right to be notified under the Act of the requirements and procedures for eligibility for Medicaid. The District Court denied injunctive relief on this issue as well. The Clearys, however,
are not appealing the notice issues.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this action pursuant to 42 U.S.C. S 1983 and 18 U.S.C. S 1331. The Clearys filed an interlocutory appeal from the District Court's denial of their motion for a preliminary injunction. We have jurisdiction of this appeal pursuant to 28 U.S.C. S 1292(a)(1).

We review the denial of a preliminary injunction for an abuse of discretion. However, the District Court'sfindings of fact are reviewed under a clearly erroneous standard. New Jersey Hosp. Ass'n v. Waldman, 73 F.3d 509, 512 (3d Cir. 1995). After applying the same standard as the District Court, we will find an abuse of discretion only upon concluding that the District Court's view was contrary to reason. U.S. v. A.R., 38 F.3d 699 (3d Cir. 1994).

## III. DISCUSSION

The Clearys contend that New Jersey's income-first rule violates the MCCA because it requires couples to allocate income from the institutionalized spouse for the maintenance of the community spouse, rather than designating a further portion of the couple's resources to create income for the community spouse. In effect, New Jersey requires couples to keep a greater portion of their resources available for "spend down" on medical care, thereby postponing Medicaid eligibility.

The Clearys argue that this method of revision violates both the letter and the spirit of the MCCA. We conclude that the MCCA, as interpreted by the federal and state agencies charged with its administration, grants states the discretion to employ either an income-first or a resource-first method when revising the CSRA. We will, therefore, affirm the decision of the District Court.

Because this appeal turns on the interpretation of a Federal statute, we will first examine the language of the statute and the context in which this particular dispute arises. Medicaid was established in 1965. While it is often thought of as providing medical care only for the indigent, it also provides coverage for the aged "whose income and

resources are insufficient to meet the costs of necessary medical services" including nursing home care. 42 U.S.C. S 1396, et seq.

Medicaid is a cooperative federal-state venture through which the states operate programs of their own design. These programs must, however, be consistent with federal standards and regulations. 42 U.S.C.A. S 1396a(a)(1-5), (a)(10)(A, C), (a)(13)(B), (a)(17). The Federal agencies responsible for administering the Act, the Health Care Financing Administration ("HCFA") and the Department of Health and Human Services ("HHS"), have not adopted formal regulations interpreting the specific provisions at issue here. Rather, these agencies have left it to the states to decide whether to consider an institutionalized spouse's income or resources in making adjustments to the standard resource allowance for community spouses. At the state level in New Jersey, it is the Division of Medical Assistance and Health Services (DMAHS) and the New Jersey Department of Human Services (DHS) which administer Medicaid. N.J.S.A. 30:40D-4.

In order to be eligible for Medicaid, a person's available income and resources may not exceed certain limits. Persons seeking eligibility for Medicaid benefits must "spend down" their available assets to the prescribed limits before becoming eligible. 42 U.S.C. S 1396 (a)(10). Prior to 1988, these eligibility rules forced couples to spend down the entirety of their resources in order for one of them to qualify for Medicaid. This resulted in the virtual impoverishment of the spouse who remained in the community.

In 1988, Congress enacted the MCCA, H.R. 2470, 100th Cong., 1st Sess., 102 Stat. 683 (1988). The chief purpose of the MCCA was to end the "pauperization [of the community spouse] by assuring that [she] has a sufficient -- but not excessive -- amount of income and resources available" while the other spouse is institutionalized. H.R. Rep. No. 105 (II), 1988 U.S.C.C.A.N. at 888. The goal of the MCCA was to provide sufficient income and resources for the community spouse while also ensuring that a fair share of the couple's resources were employed for the care of the institutionalized spouse. Through its Spousal

8

Impoverishment Provisions, the MCCA set aside a protected level of income and resources for the community spouse. This amount is "protected" since it is not included when determining the institutionalized spouse's eligibility for Medicaid and it need not be "spent down" on the institutionalized spouse's care.

Because Medicaid serves the purpose of providing necessary medical services for both the indigent and the elderly, a related goal of the MCCA is to preclude couples who possessed substantial resources from qualifying for Medicaid. By sheltering a portion of their shared resources in trusts or in the community spouse's name, a couple might appear to have fewer resources, making them eligible for Medicaid. The 1988 Act curbed this sheltering practice by attributing certain amounts of the couple's overall resources to each spouse for eligibility purposes. The MCCA seeks to achieve a balance between spousal impoverishment and apportioning medical costs appropriately. It does this through a series of complex and interlocking provisions.

The statutory provision at issue in this case is S 1396r–5(e)(2)(C) of the Spousal Impoverishment Provisions of the MCCA. This section governs revisions to the resources allotted to the community spouse.

> REVISION OF COMMUNITY SPOUSE RESOURCE ALLOWANCE. –– If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2), an amount adequate to provide such a minimum monthly maintenance needs allowance.

42 U.S.C. S 1396r–5(e)(2)(C) (emphasis added).

We must determine what constitutes the "community spouse's income" within subsection (e)(2)(C). The Clearys contend that only Carolyne's personal income (for instance, her social security check) may be considered for this purpose and that the MCCA mandates a transfer of the

9

couple's resources in an amount sufficient to generate income to make up any shortfall. New Jersey argues that, prior to a transfer of any additional resources to meet the community spouse's needs, the MCCA permits the state to consider any income the institutionalized spouse may transfer to the community spouse.

States have adopted different methods of implementing the SIP. Some use a resource-first method; others, like New Jersey, an income-first approach. Under the latter method, adjustments can be made to resources only after taking into account income transferred from the institutionalized spouse. When a hearing officer considers the sufficiency of the CSRA to meet the community spouse's MMMNA, the hearing officer may consider as part of the "community spouse's income" a contribution of the institutionalized spouse's income. The New Jersey statute provides for this in the following language:

Post-eligibility treatment of income: institutionalized individuals:

> (d) When the institutionalized individual's in come is insufficient to provide the maximum authorized deduction for the community spouse, either the institutionalized spouse or the community spouse can request a fair hearing in accordance with the N.J.A.C. 10:71-8.4. If either member can establish at the fair hearing that the income generated by the community spouse's share of the couple's resources is inadequate to raise the community spouse's income (together with the community spouse maintenance deduction) to the maximum authorized level, additional resources (beyond the community spouse's share as established at N.J.A.C. 10:71-48) may be set aside for the community spouse. The amount of resources to be set aside shall be that amount that is determined sufficient to generate sufficient income to raise the community spouse's gross income to the maximum authorized level.

N.J.A.C. 10:71-5.7(d).

The Clearys maintain that this statutory language which permits the transfer of income from the institutionalized

10

spouse to make up part of a "community spouse maintenance deduction" contravenes the plain language of the MCCA. The Clearys contend that the MCCA follows the "name on the check" rule. Following this approach, they assert, income of the institutionalized spouse cannot be considered "community spouse's income" for purposes of subsection (e)(2)(C).

To resolve this dispute, we must interpret "community spouse's income" as used in S 1396r-5(e)(2)(c). While the Federal agencies which administer the Act have not adopted formal regulations, neither have they remained silent. Both HCFA and HHS have stated in policy memoranda and letters that states may adopt either the income-first or the resource-first method and that subsection (e)(2)(C) permits consideration of potential income transfers from one spouse to another. In addition, these agencies have stated that the resource-first method, although permissible, is not mandatory.3  Nevertheless, the Clearys argue that New Jersey has run afoul of Federal standards in its implementation of the Act.

In considering this question, we will look first at the statute and, using traditional tools of statutory construction, determine if Congressional intent is apparent. If we can do so, we must give effect to that intent. Reich v. Local 30, IBT, 6 F.3d 978, 986, citing, I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 446-48 (1987), and Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). But, where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843.

_____

3. See HCFA State Medicaid Manual, HCFA-Pub. 45, S 3262.3, interpreting the Spousal Impoverishment Provisions and indicating that states should adopt an income-first approach. See also memoranda to states indicating that either resource-first or income-first may be used, HCFA Memorandum from Medicaid Bureau Director Sally Richardson (March 1994), Joint Appendix ("JA") at 99-100; HCFA Letter to Pennsylvania Department of Public Welfare (April 1994), JA at 101-103; Chicago Regional State Letter 22-94 (July 1994), JA at 103-04; Letter for Donna E. Shalala to George V. Voinovich (March 1996), JA at 105.

We agree with the District Court that the statute is complex and contains many interrelated provisions that make it impossible to attach a plain meaning to provisions in isolation. As such we find the definition of"community spouse's income" to be ambiguous within the context of subsection (e)(2)(C). As a result, we must go on to examine the purposes of the Act and the interpretation proffered by the administering agencies. Because, however, the views of the administering agencies in this case are not made in formal regulations, we are confronted with another question: What level of deference should we grant to the agency interpretation?

Where an agency has promulgated rules pursuant to notice and comment procedures, the Supreme Court has held that courts must defer to the agency's reasonable interpretation. Chevron, 467 U.S. at 844. The task becomes more complicated when the agency's interpretation is contained in informal views or guidelines outside the course of notice and comment procedures. We have questioned what degree of deference, if any, to afford an agency's views in this context. Reich, 6 F.3d at 986; E.I. du Pont de Nemours & Co. v. C.I.R., 41 F.3d 130, 135 (3d Cir. 1994), aff'd sub nom. Conoco, Inc. v. C.I.R., 42 F.3d 972 (5th Cir. 1995); Sekula v. F.D.I.C., 39 F.3d 448, 453 (3d Cir. 1994).

Since the Supreme Court's decision in Chevron , courts have deferred to an agency's reasonable interpretation of a statute over which that agency has been granted administrative and lawmaking authority. Chevron, 467 U.S. at 844. In the wake of Chevron, a great body of commentary has emerged regarding the extent of this deference. See, Sunstein, "Law and Administration After Chevron", 90 Colum. L. Rev. 2071 (1990). Despite dispute as to Chevron's scope, the principles announced there center on the institutional competence of agencies to make factual determinations and resolve issues of policy. As the Supreme Court stated in Chevron, where a statute is ambiguous and Congressional intent is not clear, agencies promulgating reasonable interpretations, while exercising their delegated rulemaking authority, will be granted deference to those reasonable interpretations.

12

The agency views at issue here are not, however, formal regulations promulgated pursuant to notice and comment rulemaking. In such cases, we have questioned whether Chevron deference applies. Therefore, we must determine the degree of deference, if any, that is warranted.

The Supreme Court has stated that, where an administrative agency's interpretation is registered in informal views, as long as that agency has a delegated authority to administer the statute and the views are made "in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge", then those views warrant some deference. Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). In Skidmore, the Court decided that employees of a packing plant were entitled to overtime pay for night-time duty even though most of the time was spent idle. In so holding, the Court relied on the informal views of the Fair Labor Standards Act Administration that had determined that waiting during night duty was akin to work. The Court decided that, although the Administration's views were not contained in formal rules and "while not controlling upon the court by reason of their authority, they do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Id. How much guidance and weight depends, however, on the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Id.

Because the Supreme Court's decision in Skidmore precedes Chevron by more than 40 years, the question arises whether Chevron's deference principle with regard to legislative rules (those made pursuant to notice and comment procedures) replaces the reasoning of Skidmore. We have noted repeatedly that Skidmore and its progeny were not expressly overruled by Chevron. See Reich, 6 F.3d at 987; Sekula, 39 F.3d at 453; International Raw Materials, Ltd. v. Stauffer Chemical Co., 978 F.2d 1318 n.9 (3d Cir. 1992).

We have tested interpretative rules against the principles enunciated in Skidmore and determined that, if an agency

13

has been granted administrative authority by Congress for
a statute, its interpretation -- despite arising in an informal
context -- will be given deference as long as it is consistent
with other agency pronouncements and furthers the
purposes of the Act.4 Most recently, in Elizabeth Blackwell
Health Center for Women v. Knoll, we concluded that
interpretive rules by an agency with lawmaking authority
(as opposed to legislative rules) will get deference even if the
agency's interpretation is not made pursuant to that
lawmaking authority. 61 F.3d 170 (3d Cir. 1995) (directive
from HCFA giving guidance to states about Medicaid plans
is an interpretative rule and gets deference when
reasonable).

The interpretations that form the basis for New Jersey's
implementation in this case are contained in informal views
from the agency with the statutory mandate to administer
the Act. The case law clearly provides that these views will
receive some deference by the court if they are consistent
with the plain language and purposes of the statute and if
they are consistent with prior administrative views.

In this case, we have an ambiguous statute as well as
agency views that are informal and not made subject to
notice and comment procedures. But the agency involved
has delegated authority under the statute to administer the
Act and therefore satisfies the requirement that a
precondition to Chevron deference is a congressional
delegation of administrative authority. See Adams Fruit Co.,
Inc. v. Barrett, 494 U.S. 638, 649 (1990). Under the
Skidmore analysis outlined above, we must probe further to
determine whether the interpretation is consistent and
contemporaneous with other pronouncements of the agency
and whether it is reasonable given the language and
purpose of the Act. We have made such an assessment,
reviewing the above factors in the order that they are made

_____

4. See Sekula, 39 F.3d at 453 (Resolution Trust Corporation
interpretation made in context of legislative rulemaking gets deference);
and, E.I. du Pont de Nemours & Co., 41 F.3d at 135 (if the secretary has
delegated rule making authority and there has been no prejudice from
delay between enactment of the statute and interpretation it will receive
deference if reasonable.)

14

in the Clearys' arguments. For the reasons we state below, we conclude that the informal views of the agencies should be given deference.

The Clearys' primary contention is that the granting to states of discretion to adopt an income-first rule runs contrary to the statute's plain language. The crux of their argument is that "income" as used in the statute is confined to the "name on the check" rule. We disagree.

To support their position of what constitutes Carolyne Cleary's income, the Clearys cite to the SIP definition of income in 42 U.S.C. S 1396r-5(b)(2). The Clearys contend that under the income provisions in subsection (b)(2), no income from the institutionalized spouse should be deemed available to the community spouse as this would violate subsection (b)(2)'s "name on the check rule."

Subsection (b) does indeed incorporate the "name on the check" rule. Basically, any income payment made solely in a spouse's name (either the institutionalized or the community spouse) is considered income available only to the named spouse. If an income payment is made in the names of both spouses, half of it is considered available to each spouse.

Why the Clearys argument fails lies in the fact that the income provisions of S 1396r-5(b)(2) do not apply to a revision of resources under S 1396r-5(e)(2)(C). Subsection (b) applies "in determining the income of an institutionalized spouse or community spouse for purposes of the post-eligibility income determination described in subsection (d)." And subsection (d), S 1396r-5(d), to which subsection (b) refers, is entitled "Protecting Income for Community Spouse." Subsection (d) defines the allowances which will be offset from the income of the institutionalized spouse before that income will be applied to pay for institutionalization costs. One such allowance is the community spouse monthly income allowance -- to the extent that it comes from the income of the institutionalized spouse. Subsection (d) defines the community spouse monthly income allowance as the difference between the MMMNA and whatever income the community spouse generates on her own. Subsection (b) then computes the

15

community spouse's MMMNA, which, as we describe above, is designed to keep the community spouse living above the poverty line. This statutory language makes it clear that a certain portion of the community spouse's income may come from the income of the institutionalized spouse.

In addition, some, or all, of the community spouse's self-generated income will be income from the CSRA. The couple may not, however, be happy with the amount of the CSRA, either as originally computed or as changed circumstances may affect it. Subsection (e)(2)(C) then provides for a revision of the CSRA if either spouse establishes that the CSRA is inadequate to raise the community spouse's income to the MMMNA. Nevertheless, in computing the community spouse's total income, one cannot focus only on the income generated by the CSRA and ignore the other sources of income defined in subsections (b) and (d).

We agree with the District Court that to conflate the detailed provisions dealing with income in subsection (d) with the resource revisions procedure addressed in subsection (e) would run contrary to the statute. The purpose of subsection (d) is to make available to the community spouse so much of the institutionalized spouse's income as is necessary to ensure her monthly need. We agree that "it would be anomalous to construe (e)(2)(C) in such a manner as to exclude the institutionalized spouse's income from the calculation." Cleary v. Waldman, 959 F. Supp. 222, 232 (D. N.J. 1997). The reading advanced by the Clearys would make (d) superfluous.

Moreover, the Act does make an explicit reference to a transfer of income from one spouse to another. In determining the amount of the institutionalized spouse's income that will be applied to the payment of the costs of the institution, subsection (d) provides that, first, the community spouse's monthly income allowance, to the extent that it is paid by the institutionalized spouse, will be deducted from the institutionalized spouse's income. This deduction will be made before the institutionalized spouse must contribute to medical costs. This language in subsection (d) demonstrates that the "name on the check"

16

principle will not prevent allocation under the SIP of the institutionalized spouse's income for the needs of the community spouse.

The Clearys argue, however, that the plain language of the MCCA guarantees the community spouse an "adequate amount of resources to provide the MMMNA." They contend that this means that a greater share of the couple's resources should go to the community spouse in the event she can not meet her monthly need. The Clearys rely on language in subsection (e) that provides that, if either spouse is dissatisfied with the CSRA and can establish that the amount of income generated by it for the community spouse is inadequate to meet the community spouse's MMMNA, "there shall be substituted, for the [CSRA] under subsection (f)(2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance." S 1396r-5(e)(2).

The Clearys rely on the words "substituted" and "an amount adequate" for their argument that any shortfall between the community spouse's income and the MMMNA must be made up by allocating more income from a larger share of resources to generate more income.

This argument ignores the import of the fair hearing process embedded within the Act. Subsection (e)(2)(A) permits a "fair hearing" if either spouse is dissatisfied with the determination of any one of the five components that create the community spouses's income: the community spouse monthly income allowance (from the institutionalized spouse), the amount of monthly income otherwise available to the community spouse, the computation of the spousal share of resources, the attribution of resources, and the determination of the CSRA. Subsection (e)(2)(B) provides for the revision of the MMMNA. Subsection (e)(2)(C) then provides for a revision of the CSRA if either spouse "establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly maintenance needs allowance . . .."

The fact that the "fair hearing" subsection, (e)(2), starts in (e)(2)(A) with a recitation of the five components that make

17

up the community spouse's income would indicate that a revision of one of those components, the CSRA, should be made only with a consideration of the other four. The five elements are interrelated and an adjustment of one will affect the other four. For this reason, a spouse may not be able to demonstrate an inadequacy of the CSRA, pursuant to (e)(2)(C), if a larger community spouse monthly income allowance is possible.

This interpretation of the language of subsection (e)(2) is consistent with the legislative history. Congress intended in subsection (e)(2)(C) that an "adequate" amount of resources to provide for the monthly need would occur after taking into account any other income attributable to the community spouse. House Conf. Rep. No. 100-661, at 256, reprinted in 1988 U.S.C.C.A.N. 923,1043.

The Clearys also contend, however, that New Jersey's income-first rule violates the purpose of the Act. They assert that the Act was designed with people like themselves in mind -- those who will exhaust their retirement savings by paying for long-term care expenses.

The Clearys are correct that, with the Spousal Impoverishment Provisions, Congress was addressing the problem of scarce resources for health care expenditures for the elderly. The legislative history refers to the ballooning costs of health care for the elderly and the inadequacy of the existing Medicare structures to deal with them. [5] The purpose of the MCCA was to address these increasing costs and the disparity between what Medicare would and would not pay for. H.R. No. 100-105(I), at 8 (1988), reprinted in 1988 U.S.C.C.A.N. 803, 810.

An important Congressional consideration at the time the MCCA's adoption was the dual problems of scarce Medicare and Medicaid resources and an aging population. But it was also evident that Congress did not intend the MCCA to

_____

5. "Greater life expectancy merely postpones the inevitable need for care of chronic and terminal illnesses....Expenditures for personal health care services for the elderly nearly tripled between 1977 and 1984, rising from $43 billion to an estimated $120 billion." H.R. No. 100-105(I), at 8, reprinted in 1988 U.S.C.C.A.N. 803, 810.

be a final solution. The bill directs the Secretary of Health and Human Services to conduct research on long-term care delivery. Congress apparently recognized the problem of long-term care financing was in its nascent stages, and that Medicaid, the sole source of financing for long-term care, must cover a broad range of income groups.

> The leading cause of financial catastrophe among the elderly is the need for long-term care, especially the need for nursing home placement. The expense of nursing home care which can range from $2,000 to $3,000 per month or more-has the potential for rapidly depleting the lifetime savings of all but the wealthiest.

Id. at 888.

Indeed, Medicaid is not just for the poorest among us. It must be available to assist an ever-increasing number of the medically needy. Granting discretion to the states to implement the Act according to their resources, priorities, and populations furthered this purpose by preserving as many Medicaid resources as possible.

The Clearys maintain, however, that the legislative history supports a resource-first approach. Again, we disagree. The Spousal Impoverishment Provisions originated in the House and contained no resource revision provision. Under the House bill, the only sources of income available to meet the community spouse's monthly need were the community spouse's own income, (e.g., social security), any income generated by the CSRA, and any transfers of income from the institutionalized spouse (e.g., the community spouse monthly income allowance).

The Senate bill added a provision reducing the resources available to the institutionalized spouse by an amount necessary to achieve the monthly need of the community spouse. The Senate did not, however, consider a transfer of income from the institutionalized spouse. The Senate bill also included a provision for a hearing to increase the MMMNA or the CSRA if either was inadequate to support the community spouse. The Clearys argue that the Senate bill accurately reflects the will of the Congress and the meaning of the MCCA.

19

The problem with this argument is that the Conference Committee adopted neither the House nor the Senate versions of the bill. Unlike the House bill, the Conference Committee provided an adjustment to the resource allowance in order to meet the community spouse's monthly need. But, unlike the Senate bill, the Conference Committee did not achieve this adjustment by shifting more resources toward the community spouse. Instead, the Conference version provided for the fair hearing process in subsection (e)(2), which permits a reconsideration of any one of the five components of the community spouse's income in subsection (e)(2)(A) and allows a revision of the CSRA in subsection (e)(2)(C). As we discuss above, subsection (e)(2)(C) should be read as a part of the entire "fair hearing" subsection.

The Clearys seize upon the inclusion of the fair hearing provision as an implicit adoption of the Senate's view that more resources should go to the community spouse in the event of a shortfall. But, this argument fails for the reasons we state above. Indeed, the Conference Committee gave no indication of an intent to augment the CSRA before increasing the community spouse monthly income allowance. The Conference Report speaks to the responsibility of the state to allow the community spouse to retain an "adequate" amount of resources to provide for her monthly need after "taking into account any other income attributable to the community spouse." House Conf. Rep. No. 100-661, at 265, reprinted in 1988 U.S.C.C.A.N. 923, 1043.

We are mindful of the daunting crisis which long-term care costs pose even to those who have saved for their retirement. The prospect of a growing elderly population in America, who are impoverished by these costs, prompted Congress to enact the Medicare Catastrophic Coverage Act. But, the MCCA creates a federal state cooperative venture for the provision of Medicaid assistance to the medically and categorically needy. The statute permits states to implement their own programs as long as they do so in accordance with the federal statute and its applicable regulations.

20

The Health Care Financing Administration and the Secretary of the Department of Health and Human Services have clearly stated their views, albeit in policy letters, that the states should have the discretion to employ either an income-first or a resource-first method. As we have shown, this policy conforms to the language of the statute, to its legislative history, and to the purpose for which it was enacted. Moreover, these agencies have statutory authority to administer the Act, and their policy is a reasonable interpretation consistent with the plain language and stated purposes of the statute. We will, therefore, grant deference to this view.

IV.

For the foregoing reasons we will affirm the judgment of the District Court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit